IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
v.                             )          No. 3:10-CR-24
                               )
BEVERLY STOKELY,               )          (VARLAN/SHIRLEY)
                               )
                Defendant.     )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on April 28, 2010, for an evidentiary hearing on the Defendant's Motion to Suppress Evidence [Doc. 14]. Assistant United States Attorney Melissa M. Millican appeared on behalf of the Government. Attorney Michael B. Menefee represented the Defendant, who was also present. The parties presented testimony and argument on the pending motion. At the conclusion of the hearing, the Court requested that the parties file supplemental briefs on a law enforcement officer's authority to handcuff a resident upon his arrival at his home prior to the search of the home pursuant to the alleged consent of the resident. The parties filed their supplemental briefs [Docs. 20 and 21] on May 6, 2010, and the Government filed a reply brief [Doc. 23] on May 10, 2010. The Court took the motion, the parties' filings, and the evidence under advisement on the following day.

# I.  POSITIONS OF THE PARTIES

The Defendant stands charged [Doc. 1] with a single count of being a felon in possession of a firearm on September 10, 2009.  She asks the Court to suppress all evidence, including two firearms, seized in the September 10, 2009 search of her home.  She argues that the search violated the Fourth Amendment because the searching officers did not have a search warrant, no exigent circumstances existed, and she refused to give consent to search.  She also contends that her husband did not voluntarily consent to the search.

The Government argues that law enforcement searched the Defendant's home subject to a valid consent to search.  It maintains that the Defendant did not refuse consent but, instead, deferred to her husband.  It asserts that the Defendant's husband voluntarily consented to the search of his home, even though he was lawfully detained at the time he gave consent.  Finally, the Government contends that if the Court finds the consent to be invalid, application of the exclusionary rule is unwarranted because the officers did not engage in any deliberate, flagrant, or patently unconstitutional violation of the law.

# II.  SUMMARY OF THE TESTIMONY

The Government presented Special Agent Rebecca Bobich, who testified that she had worked in law enforcement for eighteen years and presently worked for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).  On September 10, 2009, she was present at the Family Dollar on Magnolia Avenue when the Defendant was arrested pursuant to an arrest warrant for the armed robbery of the Holiday Inn in Dandridge, Tennessee.  The Dandridge Police Department had requested ATF's assistance in the ongoing investigation and possible federal prosecution of this

armed robbery. Agent Bobich testified that following the Defendant's arrest, Bobich orally advised the Defendant of her Miranda rights at 1:29 p.m. Agent Bobich subsequently advised the Defendant by reading a rights waiver form to her and having her initial each line. The Defendant indicated that she understood and waived her rights and then signed the form at 1:55 p.m. Agent Bobich and Task Force Officer Glen Morrell then signed the form as witnesses. The Defendant also signed a consent form for the search of her vehicle at 1:45 p.m.

Agent Bobich stated that she then asked the Defendant if she would consent to a search of her residence, but the Defendant deferred to her husband Toby Stokely. The Defendant wanted Agent Bobich to contact Mr. Stokely to get his permission to search their house and provided his cellular telephone number. The Defendant did not tell Agent Bobich that Bobich could not search her home. The Defendant told Bobich that she could use the Defendant's cellular telephone to call Mr. Stokely because he would not answer a call from an unknown number. Agent Bobich called Mr. Stokely on her own cellular telephone and left a message at 1:56 p.m., that his wife was in custody and that he needed to call Bobich. Mr. Stokely returned her call. Agent Bobich explained to Mr. Stokely that his wife had been arrested, that law enforcement had asked her for consent to search their home, and that the Defendant wanted Mr. Stokely to make the decision on that matter. She asked if Mr. Stokely would meet law enforcement at his house. Mr. Stokely agreed to meet at his house and consented to a search.

Agent Bobich testified she later learned that two Knox County Sheriff's Department Officers Walter Schmidt and Matthew Sexton also spoke with the Defendant regarding consent to search her home. This conversation was captured on an audio and video recording [Exh. 3] from Knoxville Police Department (KPD) Officer Hopkins' in-car camera. At one point on the recording,

an officer tells the Defendant that he is not getting an answer. Less than a minute later, the officer tells the Defendant, "He said he's not going to go ahead and do that, Beverly; it's up to you." To Agent Bobich's knowledge, at the time that she called Mr. Stokely, no other law enforcement officer had contacted him. While at the scene of the arrest, the Defendant told Agent Bobich that she was storing her mother's twelve-gauge shotgun, which she kept in her house under her side of the bed. Agent Bobich testified that she wanted to search the Defendant's house for the firearm and for evidence from the hotel robbery.

Agent Bobich stated that she rode with Officer Morrell and the Defendant to the Defendant's house. Other officers also met them at the residence. During the trip to her home, the Defendant did not object to law enforcement going into her residence, request that the officers obtain a search warrant, or withdraw her deferral of the decision to her husband. Once they arrived at the Defendant's residence, the Defendant was put in a Knox County Sheriff's Office (KCSO) car and transported to Dandridge within minutes of her arrival at her residence.

Agent Bobich testified that when she arrived at the Defendant's home, Knox County Sheriff's Detective Krystal Gibson was there with Mr. Stokely. Mr. Stokely was handcuffed and was sitting on the front porch talking. Several officers, including Agent Bobich, approached Mr. Stokely and explained what was happening again. Mr. Stokely seemed relaxed and understood what was occurring. Detective Gibson reviewed KCSO's consent-to-search form with Mr. Stokely. Mr. Stokely signed the consent to search form, which Detective Gibson and Agent Bobich also signed as a witnesses. Officers Kenneth Lodwick, Walt Schmidt, and Morrell were standing nearby when Mr. Stokely executed the consent form. Agent Bobich denied ever telling the Defendant or Mr. Stokely that she was obtaining a search warrant. She said that she did not threaten, deceive, or

coerce Mr. Stokely into signing the form. She also denied folding the consent form in half, and she identified the original consent-to-search form [Exh. 4], which did not bear a paper crease. Agent Bobich stated that at the time Mr. Stokely signed the consent form, it was not folded or bent in such a way that he could not read it. She asserted that, instead, the form was explained to him and he appeared to understand it.

Agent Bobich testified that after Mr. Stokely signed the consent form, officers did a brief security sweep of the residence to confirm that no one was inside. Then, Agent Bobich called for the KCSO forensic unit to document the items found in the search. The narcotics unit was also called to the house to perform a drug seizure because Detective Gibson had observed a large marijuana plant in the backyard when she first arrived at the house and marijuana and another marijuana plant were observed during the security sweep. During the thirty to forty-five minutes before those units arrived, the officers and Mr. Stokely waited on the porch. Agent Bobich asked Mr. Stokely if there were any firearms were in the house. Mr. Stokely told her that a twelve-gauge shotgun was under the Defendant's side of the bed and that a nine millimeter pistol was somewhere in the house. Once the narcotics unit arrived, Officer Veverly Hill took the consent-to-search form from Agent Bobich and reviewed it with Mr. Stokely again. Mr. Stokely did not withdraw his consent. Mr. Stokely accompanied the officers during the search of the house, and he did not withdraw consent or ever ask them to get a search warrant. Mr. Stokely could see the agents as they recovered the firearms from the master bedroom. A twelve-gauge shotgun was recovered from under the bed, and a nine millimeter handgun was taken from between the mattresses. Mr. Stokely remained in handcuffs until the guns were taken into custody.

On cross-examination, Agent Bobich testified that the hotel robbery occurred on

December 28, 2008, and the Defendant was arrested on September 10, 2009. In addition to Agent Bobich, two local law enforcement patrol cars stopped the Defendant. Once the Defendant was pulled over, she was ordered out of her car, arrested, and placed in a patrol car. The Defendant signed her <u>Miranda</u> rights waiver approximately forty minutes after she was stopped. In addition to Agent Bobich, two other officers asked the Defendant for consent to search her home. The Defendant did not give consent to search her home. Agent Bobich did not know to what the Defendant was referring when she said "I'm not going to do that" on the audio/video recording [Exh. 3]. Agent Bobich said that she was not in the patrol car with the Defendant when Bobich called Mr. Stokely and left a message. Twenty to thirty minutes elapsed between Agent Bobich's telephone call to Mr. Stokely and her arrival at the Defendant's home. Mr. Stokely returned her call, and in their short telephone conversation, she told Mr. Stokely that they had arrested his wife and that his wife wanted him to make the decision of whether to permit a search of their home. Mr. Stokely said he was going to his house and that it would take him a few minutes to get off work and get there. Agent Bobich did not recall whether Mr. Stokely gave consent to search the house during their telephone conversation.

Agent Bobich testified that it took approximately ten minutes to travel from the Family Dollar store to the Defendant's residence. When she arrived at the residence, Mr. Stokely, Detective Gibson, and another officer whom Gibson had called for back up were already there. Mr. Stokely was already handcuffed and remained in handcuffs until the guns were secured. Within minutes of her arrival, Mr. Stokely was given the consent form. He signed the consent form at 2:35 p.m. Agent Bobich did not recall whether Mr. Stokely's handcuffs were removed for him to sign the form or if he signed while wearing them. At the time, Agent Bobich, Detective Gibson, and

Officer Kenny Lodwick were on the front porch with Mr. Stokely.  Officers Morrell and Walt Schmidt were also standing nearby.  Right after receiving Mr. Stokely's consent to search the house, the officers performed a security sweep.  The Defendant was transported from the residence at 2:38 p.m.  Within five minutes of the security sweep, the forensic unit was called to report to the residence.  The forensic unit arrived thirty to forty-five minutes later.

Agent Bobich stated that she had reviewed her recollection of the events of that day with the Assistant United States Attorney while other officers were in the room.  Officer Lodwick was there, and Agent Bobich recalled that his account of the events of that day was similar to hers.

On redirect examination, Agent Bobich testified that the Defendant repeatedly deferred consent to search her home to her husband.  She stated that she did not get a search warrant for the Defendant's residence because she had consent to search it.  She testified that she would prefer to have consent to search a home from the homeowner, rather than to search pursuant to a search warrant, because the owner walking through the home with her could show her where items were located.  Agent Bobich reiterated that she never told the Defendant or Mr. Stokely that she had a search warrant.

KCSO Detective Matt Sexton testified that he had worked in law enforcement for fifteen years.  He stated that he was on the scene on September 10, 2009, when the Defendant was arrested.  He spoke briefly with the Defendant about consent to search her home.  The Defendant did not give consent but deferred to her husband.  He stated that he began filling out the consent-to-search form because he believed that the Defendant might give consent.  His partner Detective Walt Schmidt tried to call the Defendant's husband but did not reach him.  Although the Defendant offered to call her husband on her own cellular telephone, Detective Sexton did not permit her to do

so for officer safety and to prevent destruction of evidence. He and Detective Schmidt tried to get the Defendant to make a decision regarding consent to search her home, but she continued to defer to her husband.

On cross-examination, Detective Sexton testified that either he or Detective Schmidt asked the Defendant for consent to search her home. Detective Sexton could not recall the exact words the Defendant used to defer to her husband. The Defendant never gave him consent to search her home, and he did not speak with her husband. He did not go to the Stokely home that day.

KPD Investigator Glen Morrell testified that he had worked in law enforcement for approximately twelve years and that he is assigned to the ATF Task Force. He was at the scene of the Defendant's arrest on September 10, 2009, and witnessed Agent Bobich advise the Defendant of her Miranda rights. The Defendant waived her rights and signed the rights waiver form. He also observed the Defendant consent to the search of her vehicle and sign a consent-to-search form. The Defendant agreed that she understood her constitutional rights with regard to both the rights waiver and the search of her vehicle. When Agent Bobich asked the Defendant if she would also consent to the search of her home, the Defendant said she preferred for her husband to make the decision. The Defendant then gave Agent Bobich her husband's telephone number. Agent Bobich called Mr. Stokely and left a message. Mr. Stokely called Agent Bobich back.

Investigator Morrell stated that he and Agent Bobich transported the Defendant to her residence. Once there, he remained in the car with the Defendant, while Agent Bobich got out. During the time that he was waiting in the car with the Defendant, the Defendant did not say that she did not want law enforcement to go into her house, nor did she ever mention a search warrant. He did not ever mention a search warrant to the Defendant. After the Defendant was transported,

Investigator Morrell stayed at the Defendant's house and heard Agent Bobich and Detective Gibson advise Mr. Stokely of the consent-to-search form. Investigator Morrell was standing on the porch when Investigator Veverly Hill arrived. Investigator Hill also advised Mr. Stokely of the consent-to-search form. Mr. Stokely never withdrew consent or asked law enforcement to obtain a search warrant. Investigator Morrell did not hear anyone tell Mr. Stokely that they were in the process of obtaining a search warrant.

Investigator Morrell testified that he and Agent Bobich searched the Defendant's bedroom for firearms. Detective Gibson was also present. Mr. Stokely was sitting in the living room and could see and hear the officers searching his bedroom. Investigator Morrell found a shotgun under the bed and a handgun between the mattresses.

On cross-examination, Investigator Morrell stated that when Agent Bobich asked the Defendant for consent to search her home, the Defendant said that she did not mind but that she wanted her husband to make the decision. He could not recall the Defendant's exact words. He was not aware of anyone else asking the Defendant for consent to search her home, but he arrived on the scene a little after the Defendant was stopped. When Mr. Stokely returned Agent Bobich's call, Agent Bobich spoke with him briefly.

Investigator Morrell testified that after they arrived at the Defendant's house, he remained in the car with the Defendant for about ten minutes, after Agent Bobich got out. Investigator Morrell did not see Mr. Stokely sign the consent form, but he was in standing front of the house and heard Investigator Hill review the consent form with Mr. Stokely a second time before the search commenced. He stated that he heard Agent Bobich recount her recollection of the events of September 10, 2009, at a pretrial preparation meeting at the U.S. Attorney's office.

On redirect examination, Investigator Morrell stated that after the Defendant was transported from her residence, he helped secure the area around the house and then assisted with the search. He estimated that thirty to forty-five minutes elapsed before the search began. He said that nothing anyone said during the pretrial preparation meeting affected his testimony.

KCSO Detective Krystal Gibson testified that she has worked in law enforcement for nine years and is presently in the Major Crimes Unit. She stated that on the morning of September 10, 2009, she went to the Defendant's house to serve an arrest warrant. No one was home, so she left to eat lunch. After hearing that the Defendant's vehicle had been stopped, Detective Gibson returned to the residence alone. Mr. Toby Stokely, a "clean-cut, larger gentleman," arrived, and she handcuffed him for her safety. Less than five minutes later, another officer arrived.

Detective Gibson stated that she subsequently advised Mr. Stokely of his constitutional rights using KCSO's consent-to-search form, while they stood on the front porch with Agent Bobich. During this time, the atmosphere was relaxed. Mr. Stokely was polite and cooperative. He did not appear to be under the influence of drugs or alcohol. Detective Gibson wrote on the consent form that Mr. Stokely reported having attended two years of college. Mr. Stokely appeared to understand his rights, and she explained to him that he could withdraw consent at any time. Mr. Stokely consented to the search of his house and signed the consent form. She and Agent Bobich signed the consent form as witnesses. Detective Gibson stated that no one tricked Mr. Stokely by presenting a folded paper for him to sign without explaining what it was. Also, no one mentioned a search warrant to him. Detective Gibson believed that Mr. Stokely's consent was voluntary, knowing, and uncoerced. After Mr. Stokely signed the consent form, Detective Gibson called for the forensic unit, which arrived within thirty to forty minutes. Investigator Veverly Hill

also reviewed the consent-to-search rights with Mr. Stokley that day, and he again gave consent to search his home.

Detective Gibson stated that she spoke with the Defendant briefly at her residence when retrieving the Defendant's purse so that she could take it with her. During their brief encounter, the Defendant did not say that she did not want law enforcement going into her home or mention a search warrant. Likewise, Detective Gibson did not mention a search warrant to the Defendant.

On cross-examination, Detective Gibson testified that she was not at the scene of the Defendant's arrest, and she never heard the Defendant give consent to search her home. Detective Gibson stated that she was at the Defendant's house that day to serve an arrest warrant for the Defendant. She left early from lunch upon hearing that the Defendant's car had been spotted, went to the Defendant's house, and sat in her car until Mr. Stokely arrived in an SUV or truck. Detective Gibson called for a backup unit and then approached Mr Stokely. As Mr. Stokely got out of his vehicle, Detective Gibson identified herself and asked him to turn around and place his hands behind his back to be handcuffed. She said that Mr. Stokely was not under arrest but that she handcuffed him behind his back for officer safety. She explained to Mr. Stokely that he was not under arrest. Although she would not have removed the handcuffs at Mr. Stokely's request at this time, she said that she would have allowed him to leave. Within five minutes of handcuffing Mr. Stokely, Officer Scalf arrived. Detective Gibson stated that she then changed Mr. Stokely's handcuffs to "double cuffs" by linking two sets of handcuffs together in order to make Mr. Stokely more comfortable due to his larger stature. She and Officer Scalf stood in the driveway, talking with Mr. Stokely. Not more than thirty minutes later, another group of officers arrived. She did not recall whether Mr.

Stokely asked for a drink or cigarettes during this time.

Detective Gibson stated that she and Mr. Stokely were on the front porch when he signed the consent form. She testified that she removed the handcuffs for Mr. Stokely to sign the consent form, but she did not recall if she put them back on him. Although she did not remember reading the consent form to Mr. Stokely, she knew that she did so because that is her normal practice. Agent Bobich was standing close by when Mr. Stokley signed the form. She did not recall Mr. Stokely asking for a copy of a search warrant. She did not recall whether a security sweep of the house was performed before or after Mr. Stokely signed the consent form. She and Agent Bobich performed the security sweep for officer safety. The search was completed and the officers left sometime after 4:00 p.m. that day. She did not recall at what point she removed Mr. Stokely's handcuffs.

On redirect examination, Detective Gibson testified that after lunch, she waited for Mr. Stokely to arrive at his residence in the parking lot of an adjacent assisted living facility. She had been informed that Mr. Stokely was coming to meet law enforcement at his house. She stated that if Mr. Stokely had wanted to leave, she would have removed the handcuffs and permitted him to leave the property, but that as long as he remained there, he had to be in handcuffs. She said that Mr. Stokely was quite a bit larger than her and that she had been informed that there were weapons at the house. Detective Gibson stated that the protective sweep took two to three minutes. On recross-examination, Detective Gibson reiterated that she did not remember reading the consent form to the defendant but her normal practice was to read it.

The Government next called KCSO Narcotics Investigator Veverly Hill, who testified that she has worked in law enforcement for six years. She stated that on September 10, 2009, she

was called to the Defendant's residence to seize marijuana plants in the back yard. When she arrived at the residence, Agent Bobich and Detective Gibson were there along with other officers. The Defendant had already been transported from the residence. She advised Mr. Toby Stokely of his rights using a consent-to-search form. Investigator Hill stated that she advised him of his rights again because it is her policy always to make sure an individual understands his rights and the consent form before she enters their home. She explained to Mr. Stokely that he could withdraw his consent at any time. Mr. Stokely indicated that he understood his rights and consented to the search of his house. He never requested a search warrant, and Investigator Hill never told him that she had a search warrant. She stated that Mr. Stokely voluntarily gave consent to search his residence and that no one, including her, coerced, deceived, or tricked him into giving consent to search.

Investigator Hill stated that Mr. Stokely did not withdraw consent as she walked through the residence with him. Mr. Stokely remained handcuffed at that time. Although she was not the one who handcuffed him, Investigator Hill said that she too would have handcuffed him to preserve officer safety because there were guns in the house. At the time the guns were recovered from the master bedroom, Mr. Stokely was sitting on the couch in the living room while Investigator Hill inventoried marijuana plants and drug paraphernalia that she was seizing from the residence. She and Mr. Stokely could see and hear what was occurring in the bedroom, and Mr. Stokely did not withdraw consent.

On cross-examination, Investigator Hill testified that she first met with Mr. Stokely on the front porch of the house. Mr. Stokely was in handcuffs, and a young boy was on the porch with him. Agent Bobich, Detective Gibson, and two other officers from Investigator Hill's unit were there. She retrieved the signed consent form from Agent Bobich and reviewed it with Mr. Stokely.

Mr. Stokely accompanied her and another armed officer as they walked through the house. Investigator Hill and two other armed officers were in the living room while Mr. Stokely was seated on the couch. On redirect examination, Investigator Hill stated that during the walk through the house, Mr. Stokely' hands were handcuffed in the front of his body.

The Defendant called Toby Stokely, who testified that he is a railroad foreman and has been married to the Defendant for almost twelve years. He was at work around 2:00 p.m., on September 10, 2009, when he received a telephone call, which he believed to be from his wife, but which turned out to be from a female ATF agent. The agent told him that his wife had been arrested on a warrant. She told him that she had a warrant for him too and that if he did not come to his house, she would arrest him at his job site. Mr. Stokely said he agreed to go home. He then told his boss that something had come up, left work, and went home. During the seven-minute drive, he called his mother and told her that his wife had been arrested, that the agent said she had a warrant for him, and that they were going to pick him up at work if he did not come home. He told his mother that he did not know what was going on but that he would let her know when he found out.

Mr. Stokely stated that as he drove to the bottom of his driveway, he saw a female officer walking toward him from "the old folks' home." As he got out of his truck and started to get his work tools, he glimpsed a police car coming down his driveway. The female officer walked up to him and told him that she had been instructed to detain him until an ATF agent arrived. The female officer asked what he had been reaching for, and he explained to her that he had been reaching into his truck for his radio and tools. She instructed him to step to the front of the truck and stated that she was handcuffing him for her protection. She handcuffed him and walked him to the front porch. At the time she handcuffed him, a male officer had also arrived. Mr. Stokely asked the

officers if he could sit in a chair because his arthritis was bothering him, but they told him to remain seated on the concrete porch.  Thirty minutes later, he asked if he could smoke a cigarette, and they permitted him to do so.  He proceeded to smoke four or five cigarettes and remained on the porch with the officers for about one hour.

Mr. Stokely stated that a female ATF agent, whom he later identified as Agent Bobich, arrived with Jefferson City Detective Kenny Lodwick and the Defendant.  Agent Bobich approached him, held up a paper, and said she was waiting on some officers to bring her the search warrant for his house.  When Mr. Stokely questioned this, she stated that she had a search warrant relating to the robbery of a hotel in Jefferson City.  About fifteen minutes later, Mr. Stokely's son arrived.  The officers handcuffed Mr. Stokely's son and made him sit on the porch also.

Mr. Stokely testified that more police cars arrived at his residence, and the Defendant was taken away.  After Agent Bobich spoke to the officers that had just arrived, she told Mr. Stokely that she had the search warrant.  She told him that he needed to sign a folded piece of paper in order to get a copy of the search warrant.  No one read that paper or any form to him.  He signed the paper.  Mr. Stokely did not think he could refuse the officers' entry into his house because they had a search warrant.  He did not walk through the house with the officers.

Mr. Stokely stated that a few minutes after Agent Bobich announced that she had a search warrant, Detective Kenny Lodwick came up to him and remarked that Mr. Stokely must be getting tired of seeing him.  Mr. Stokely responded that he was tired of seeing Lodwick because Lodwick kept harassing his wife who had not done anything.  Mr. Stokely stated that Detective Lodwick use to mow grass at the Holiday Inn where Mr. Stokely's wife was the head of housekeeping.  He said that the Defendant use to help Detective Lodwick with cases but when she

stopped, Lodwick began harassing her and making sexual comments. Mr. Stokely advised the Defendant to stop helping Detective Lodwick when he began making the harassing comments. Mr. Stokely characterized Detective Lodwick as a "snake in the grass" and said that he would not have allowed Lodwick into his house that day if he had thought that he had a choice. He said that Detective Lodwick had been the first one to question the Defendant that day and appeared to be "running the show," despite the presence of other law enforcement agencies.

Mr. Stokely testified that he was in handcuffs for three hours from the time that he arrived at his house until just after 5:00 p.m. that day. He said that he was handcuffed in front the entire time and that he was never "double cuffed," despite requesting something wider due to old sports injuries. When he signed the document that the officers presented to him, he first thought it was an arrest warrant for him and then he thought that he was going to get a copy of the search warrant if he signed it. A male officer held the paper for him while he signed it because he was wearing handcuffs. He never told the officers to stop searching because he thought that they had a search warrant and that he could not stop them. At one point, he asked Agent Bobich when he could read the search warrant, and she told him that she would give him a copy later, after she got the search started.

On cross-examination, Mr. Stokely testified that when he spoke with Agent Bobich on the telephone, she did not say whether the warrant she had for him was a search warrant or an arrest warrant. Mr. Stokely said he thought she had an arrest warrant. When he got to his house, Detective Gibson handcuffed him in the front. He stated that it was possible that she handcuffed him in the back briefly and then moved the handcuffs to the front. While awaiting Agent Bobich, he talked with the Detective Gibson and the male officer at his home, but they did not know what was

happening.  Mr. Stokely said he was not intimidated at this time.

Mr. Stokely stated that Agent Bobich arrived an hour after Detective Gibson and the male officer.  He said that about thirty to forty minutes later, after the last group of officers arrived, he signed a paper.  He denied that Detective Gibson told him what the paper he signed said.  He did not recall her asking him about his education level.  He stated that he had one semester of college but that he might have told her that he had two years.  Mr. Stokely said that when the officer handed him the paper to sign, "it was folded maybe half-way."  He said that without reading the paper, he put his name on the line, expecting to get a copy of the search warrant.  No one explained his constitutional rights to him.  He did not recall Investigator Veverly Hill going over the paper that he had signed with him.

Mr. Stokely testified that after the officers had been in his house for a while, they asked him to come in.  He said that he and his son entered the house, and he sat in the living room.  Some officers went into the bedroom and closed the bedroom door.  He overheard Detective Lodwick say that they were looking for surveillance cameras.  Mr. Stokely said that he had told the officers that there was a twelve gauge shotgun and a nine millimeter gun under his bed.  Both guns were on his side of the bed.  He said that when he initially told the officers about the guns in his house, he told them that he did not know where the nine millimeter gun was located.  He said that he had the shotgun, which belonged to his mother-in-law, because he offered to keep it for her after her husband died.

On redirect examination, Mr. Stokely testified that before he signed anything, he heard Agent Bobich say that she was waiting on a search warrant.  After awhile, other officers arrived, and Agent Bobich stated that she now had the search warrant.  At that point, he signed a

paper and requested a copy of the search warrant. Agent Bobich did not give him a copy of the search warrant but, instead, said that she would get him a copy after she got the search started.

Reverend Zora Robinson, Mr. Stokely's mother, testified that she is a minster with Royal Christianship Ministries and that she preaches at the AME Zion Church. She said that on September 10, 2009, Mr. Stokely called her and told her that she might have to come get him out of jail. He said that an officer had called him from his home and told him to come to his house or they would come and pick him up. When Ms. Robinson asked what this was about, Mr. Stokely replied that he did not know but that it had something to do with the Defendant and that the officer had mentioned a warrant. She asked Mr. Stokely to call her later to let her know what was happening. She stated that two to three hours later, Mr. Stokely called a second time and said that he had been handcuffed for two hours. He said the police had wanted to search his house. He told Ms. Robinson that he wanted them to show him a search warrant, but they never showed a search warrant to him. He said they also wanted him to sign a paper, which he said that he signed without first reading it because he had nothing to hide.

On cross-examination, Ms. Robinson stated that she was working on the computer when Mr. Stokely first called her and that she did not remember the time of that call. When Mr. Stokely called her back two or three hours later, he was at home and the officers were gone. Mr. Stokely had not been arrested. He told her that the Defendant was in custody.

### III. FINDINGS OF FACT

Based upon the testimony and the exhibits presented at the April 28 evidentiary hearing, the Court makes the following factual findings: On September 10, 2009, KCSO Detective

Krystal Gibson went to the Defendant's residence to arrest the Defendant for the December 2008 armed robbery of the Holiday Inn in Dandridge, Tennessee. No one was at the residence, so Detective Gibson went to lunch. While having lunch, she received word that the Defendant had been stopped. The Defendant was pulled over at a Family Dollar store by two local law enforcement patrol cars. The Defendant was ordered out of her car and arrested pursuant to an arrest warrant. ATF Special Agent Rebecca Bobich arrived at the scene of the Defendant's arrest shortly thereafter. At some point after the Defendant's arrest and while she was detained in a police car, KCSO Detectives Matt Sexton and Walt Schmidt asked the Defendant to give consent to search her residence. The Defendant did not give consent but deferred to her husband. Detective Schmidt tried to call Mr. Stokely but could not reach him. Although the detectives tried to get the Defendant to make a decision about granting consent to search her home, she continued to defer to her husband.

Approximately forty minutes after the Defendant was stopped, Agent Bobich reviewed the Miranda rights with the Defendant, using a rights waiver form. The Defendant agreed that she understood her rights and waived them, signing the rights waiver form. Ten minutes before signing the rights waiver form but after the Defendant had received an oral advice of her Miranda rights, the Defendant signed a consent form, agreeing to permit the officers to search her car. While at the scene of her arrest, the Defendant told Agent Bobich that she kept a twelve gauge shotgun under her bed. Agent Bobich asked the Defendant if she would consent to the search of her residence, but she deferred to her husband, Toby Stokely. The Defendant gave Agent Bobich Mr. Stokely's cellular telephone number but warned that he would not answer a call from a number that he did not know. Agent Bobich called Mr. Stokely and left a message at 1:56 p.m. that his wife was in custody and that he needed to call Agent Bobich. Shortly after 2:00 p.m., Mr. Stokely returned

her call. She told him that his wife was in custody and asked if he would meet her at his house. Mr. Stokely agreed to meet her at his house.

After hearing that the Defendant had been stopped, Detective Gibson returned to the Defendant's residence to await Mr. Stokely's arrival. When he arrived around 2:10 p.m., she called for backup and then approached Mr. Stokely and handcuffed him. About five minutes later, another officer arrived, and Detective Gibson moved Mr. Stokely's handcuffs to the front and placed him in double cuffs. The officers stood in the driveway talking with Mr. Stokely, who was seated on the front porch. Mr. Stokely was permitted to smoke during this time.

About twenty minutes later Agent Bobich, Investigator Glen Morrell, and the Defendant arrived at the residence. Investigator Morrell waited in the car with the Defendant for about ten minutes before the Defendant was transported from the scene. Agent Bobich approached Mr. Stokely, and was present when Detective Gibson reviewed the consent to search form with him. Mr. Stokely signed the consent form at 2:35 p.m. Agent Bobich and Detective Gibson performed a brief security sweep of the house and saw a marijuana plant and loose marijuana inside. A forensic unit and a narcotics unit were called to the scene and arrived thirty to forty-five minutes later. Investigator Veverly Hill of the narcotics unit got the consent form, which Mr. Stokely had already signed, and reviewed it with him again. Mr. Stokely, who was still handcuffed, accompanied the officers in the search of the house and was seated in the living room in a position to see into the master bedroom at the time that the firearms were seized. Investigator Morrell seized a twelve gauge shotgun from under the bed and a nine millimeter pistol from between the mattresses of the bed in the master bedroom. While Mr. Stokely was seated on the living room couch, Investigator Hill inventoried the marijuana and drug paraphernalia seized from the residence.

# IV. ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In order for the instant warrantless search of the Defendant's residence to pass Fourth Amendment muster, it must fall within one of the narrowly drawn exceptions to the warrant requirement. See Katz v. U.S., 389 U.S. 347, 357 (1967) (holding that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions"); Jones v. U.S., 357 U.S. 493, 499 (1958) (observing that "[t]he exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn"). One exception to the warrant requirement is a search pursuant to the voluntary consent of one with authority. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998) (holding that "[i]t is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search"). Here, the Government argues that the officers properly searched the Defendant's home pursuant to the voluntary consent of her husband. The Defendant contends that (1) she never consented to the search of her home and (2) the consent allegedly obtained from her husband was not voluntary. Thus, the sole question for the Court to determine is whether the officers had the valid consent of the homeowners at the time of the search.

In determining whether consent was granted in this case, the Court is guided by the following principles: Consent to search must be "unequivocal and intelligently given, untainted by duress or coercion." United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990) (citing United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977)); see also United States v. Ivy, 165 F.3d 397, 402

(6th Cir. 1998).  Furthermore, consent must be more than mere acquiescence to apparent lawful authority.  Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968); United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999).  The government bears the burden of proving that the consent was voluntary and not "the result of coercion, duress, or submission to a claim of authority" based upon the totality of the circumstances.  Id.  The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence.  Id. at 385.

## A.  CONSENT OF THE DEFENDANT

The Defendant argues that despite being asked for consent to search her residence by three officers at the scene of her arrest, she never gave the law enforcement officers consent to search her home.  In contrast, she executed a consent-to-search form that granted permission for the search of her car.  She contends that because she was physically present at her residence before the search and did not give consent, the officers could not lawfully search pursuant to consent from her husband.  The Government argues that the Defendant never refused consent to search her residence but, instead, deferred the decision of whether to grant consent to her husband.  It asserts that because the Defendant consented to the search of her car, she was aware of her constitutional rights and understood that she could have refused consent to search her home.

Officers may search a residence pursuant to the valid consent of one with common authority over the residence and that consent is valid as to an absent resident.  United States v. Matlock, 415 U.S. 164, 170 (1974).  On the other hand, if a physically present co-occupant refuses consent to search the residence, the search is invalid as to that occupant even if another co-occupant consents to the entry and search.  Georgia v. Randolph, 547 U.S. 103, 106, 120 (2006).  In applying

this law to the instant case, the Court must determine whether the Defendant's failure to give express consent at either the scene of her arrest or when she was transported to her home and/or her deferral of the decision of whether to permit the search to her husband constituted an objection to the search.

The Court makes the following factual findings with regard to the question of the Defendant's consent to search her home:  After the Defendant  was arrested at the Family Dollar store and detained in the back of a police car, KCSO Detectives Matt Sexton and Walt Schmidt asked the Defendant for consent to search her residence.  The Defendant did not give consent but, instead, said that she wanted her husband to make that decision.  She gave her husband's telephone number to the officers.  Detective Schmidt called Mr. Stokely but did not reach him.  When asked whether the Defendant seemed to be "waffling" about consent, expressly refusing to give consent, or expressly deferring the decision to her husband, Detective Sexton testified, "To my recollection, she kept deferring to her husband to make–for him to make the decision."  Detective Sexton admitted that he and Schmidt tried to get the Defendant to make a decision about granting consent to search her home, but he said that she continued to defer to her husband.

Agent Bobich also spoke with the Defendant at the scene of her arrest.  Agent Bobich advised the Defendant of her rights under Miranda, then requested and received consent to search the Defendant's car.  The Defendant executed a consent-to-search form for the search of her vehicle. The Defendant also executed a Miranda rights waiver.  When Agent Bobich asked if the Defendant would consent to a search of her home, the Defendant deferred to her husband Toby Stokely and gave Agent Bobich his cellular telephone number.  The back of the Defendant's rights [Exh. 1] bears a telephone number with the name "Toby" written beside it.  The audio/video recording [Exh. 3] reveals that the Defendant gave this same telephone number to Agent Bobich at the scene of her

arrest. During the time that the Defendant rode from the Family Dollar to her home and during the ten minutes that she waited in the patrol car at her home, the Defendant did not affirmatively grant consent to search her home, affirmatively refuse consent to search her home, or request that the officers get a search warrant.

In oral argument, defense counsel contended that the Defendant refused consent by stating "I don't want to do that," which statement Defendant alleges was captured on the audio recording [Exh. 3] from the scene of her arrest. Although it acknowledged that the Defendant did not give consent to search her home, the Government argued that this statement by the Defendant was a deferral to her husband, not a refusal of consent. The Court has reviewed the audio/video recording of the arrest but cannot make out this statement on the audio. At the approximate time that this comment was allegedly made, there are several conversations between officers occurring, overlaid by the noise of traffic on the adjacent street. Nevertheless, the Court finds that considering this comment in context of the other audible remarks by the Defendant reveals that the Defendant was not affirmatively refusing consent. Following the time that this comment is said to have occurred, the Defendant gives her husband's cellular telephone number to Agent Bobich and agrees that she wants the officers to talk with her husband about searching their house. Finally, the Court observes that Detective Matt Sexton, one of the officers to whom the comment "I don't want to do that" was allegedly made, testified that he could not recall the Defendant expressly refusing to give consent.[1] Accordingly, the Court finds that the Defendant did not refuse to give consent but, instead, deferred the decision of whether to permit the search of their home to her husband.

---

[1]The Court notes that Detective Sexton was not questioned about the audio/video recording [Exh. 3], nor asked to explain the comment "I don't want to do that."

Having established the factual scenario, the Court next turns to the question of whether that deferral or the lack of an affirmative consent on the part of the Defendant makes the search unreasonable as to her under Randolph.  In order to be valid, consent must be "unequivocal." Cooke, 915 F.2d at 252.  Case law suggests that the refusal of consent must be similarly plain in order for that refusal to trump the consent of another resident with common authority over the premises.  In Randolph, the defendant was at the residence at the time the officers sought consent to search and "expressly refuse[d]" consent.  Id. at 106.  The Supreme Court acknowledged that it was "drawing a fine line" between Randolph's circumstances and prior case law in which the defendant had been detained nearby, Matlock, 415 U.S. at 166, or asleep inside the house, Illinois v. Rodriguez, 497 U. S. 177, 180 (1990), at the time the co-occupant consented:  "[I]f a potential defendant with self-interest in objecting is in fact at the door and *objects*, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the colloquy, loses out."  Randolph, 547 U.S. at 121(emphasis added); see also United States v. Ayoub, 498 F.3d 532, 540-41 (6th Cir. 2007) (approving consent by defendant's sister who had apparent authority over premises, when officers had previously permitted the defendant to leave the residence without requesting consent to search), cert. denied, 129 S. Ct. 37 (2008).

The Supreme Court approved what it agreed was a highly formalistic distinction as long as the police had not removed the potential objector to prevent his or her objection.  Randolph, 547 U.S. at 121; Ayoub, 498 F.3d at 541 (holding that the police did not remove the defendant from the home to prevent his objection to consent, even if they did not avail themselves of the opportunity to ask for his consent before he left of his own volition).  The Supreme Court's emphasis on the presence of the defendant at the home and the affirmative objection to the search indicates that a

defendant's silence as to consent or deferral of consent to another is not sufficient to overcome the express consent of a co-occupant.

Deferral of the decision to consent to another resident simply cannot be interpreted as an express objection to the search. In <u>Ayoub</u>, the Sixth Circuit addressed the authority of the defendant's married, non-resident sister, whom the parents had left in charge of the home, to consent to a search, which resulted in the seizure of evidence implicating her resident brother, the defendant. <u>Ayoub</u>, 498 F.3d at 541. Our appellate court found important the fact that the sister had not deferred the decision to the defendant. <u>Id.</u> The court concluded that "because [the defendant] was not present and objecting, [his sister] had authority to consent to the search." <u>Id.</u> The court's analysis indicates that a deferral does not carry the same weight as an express consent or refusal. The Second Circuit has found that the warrantless search of the defendant's home was valid as to him pursuant to the consent of a co-resident (the defendant's wife), when the defendant deferred the decision of whether to allow the search to his wife. <u>United States v. Francis</u>, 319 Fed. Appx. 27, 27 (2d Cir. 2009). Finally, the Court notes that the Eastern District of North Carolina has also relied upon the above analysis from <u>Randolph</u> to hold that a deferral by the defendant did not vitiate the co-occupant's consent. <u>United States v. Foster</u>, 654 F. Supp. 2d 389, 397 (E.D. N.C. 2009) (observing that the defendant "did not expressly refuse consent to search the apartment" but, instead, "deferred the question of consent to [his fiancé] and telephoned her").

Based upon this review of the case law, the Court concludes that the Defendant's deferral of consent to her husband and the lack of affirmative consent from the Defendant does not make the search of the house unreasonable as to the Defendant, if the officers obtained valid consent from another resident. This brings the Court to the question of whether the Defendant's husband

gave valid consent to search their home.

## B. CONSENT OF DEFENDANT'S HUSBAND

The Defendant contends that her husband Toby Stokely did not provide valid consent for the search of their home. She argues that Mr. Stokely's consent was not voluntarily given because (1) he was illegally detained, (2) he acquiesced to police authority because the officers told him they had a search warrant, and (3) that he was deceived or coerced into granting consent. The Government counters that Mr. Stokely voluntarily consented to the search of his home.

*(1) Detention*

The Defendant argues that Detective Gibson had no authority to handcuff and detain Mr. Stokely when she arrived at his residence on September 10, 2009. She maintains that Detective Gibson lacked probable cause or reasonable suspicion that Mr. Stokely had committed any crime. She also contends that the officers did not have a search warrant, which might give them the limited authority to detain an occupant of the residence during the search. Moreover, she asserts that Detective Gibson had no reason to fear for her personal safety or to believe that Mr. Stokely was armed and dangerous. She concludes that Mr. Stokely's illegal detention for forty-five minutes before he executed the consent-to-search form is alone reason to suppress any evidence seized during the warrantless search.

The Government responds that the totality of the circumstances reveals that Detective Gibson had reasonable suspicion to detain Mr. Stokely. It contends that at the time Detective Gibson handcuffed Mr. Stokely, she had observed a marijuana plant in his backyard, knew that there

were guns in the house, and was acting upon the direction of the ATF to detain Mr. Stokely until Agent Bobich arrived. Moreover, the Government asserts that the twenty-four-minute lapse of time during which Mr. Stokely remained in handcuffs did not transform his investigative detention into an arrest. Instead, the Government argues that during that time, the officers were continuously engaged in activity aimed at confirming or dispelling their reasonable suspicion that the residents of the home were involved in armed robbery, the cultivation of marijuana, or the possession of illegal firearms.

When Toby Stokely arrived at his home around 2:11 p.m. on September 10, 2009, KCSO Detective Krystal Gibson approached him, handcuffed him after he exited his truck, and walked him to his porch, where she had him sit for the next twenty-four minutes until he executed a consent-to-search form. Not every contact between a police officer and a member of the public is a seizure. United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled. United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert denied, 474 U.S. 851 (1985). The test for when an individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to

leave.  Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990).  The Court finds it beyond any peradventure that Mr. Stokely was seized with in the meaning of the Fourth Amendment when Detective Gibson placed him in handcuffs.  No reasonable person in these circumstances would have believed that he or she could have left his or her own home.  Thus, the Court must examine the officer's authority for thus seizing Mr. Stokely.

The Government contends that Detective Gibson properly conducted an investigatory detention of Mr. Stokely based upon the specific and articulable facts she possessed at the time.  "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure."  United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted).  Assessing whether an investigatory stop comported with the Fourth Amendment is a two step process:  First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts.  United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006).  Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances.  Id.

A court reviewing the legality of an investigative stop must consider the totality of the circumstances in evaluating the presence of reasonable suspicion.  United States v. Arvizu, 534 U.S. 266, 273 (2002); Martin, 289 F.3d at 398.  Although an officer may not rely upon a mere hunch

to support a <u>Terry</u> stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." <u>Arvizu</u>, 534 U.S. at 274. Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. <u>Martin</u>, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. <u>Id.</u> at 397.

In examining the totality of the circumstances in the present case, the Court finds that at the time Detective Gibson seized Mr. Stokely, she had the following information: Beverly Stokely, the Defendant in this case, lived at the residence and had a warrant for her arrest. Detective Gibson knew that the Defendant was not at the house but, in fact, had already been arrested at another location. Detective Gibson knew that the Defendant had stated that there was a firearm in the house. Detective Gibson also knew that the Defendant's husband was on his way to the house to meet with law enforcement. Finally, Detective Gibson had been told to detain Mr. Stokely until the ATF arrived at the house.[2]

Viewing the totality of the circumstances, the Court finds that neither Detective Gibson nor, indeed, any officer involved with this case, possessed "specific and articulable facts" that would justify a reasonable suspicion that Mr. Stokely was involved or was about to be involved in criminal activity. The only facts about Mr. Stokely that the record reflects the officers knew at around 2 p.m. on September 10, 2010, are that he was the Defendant's husband, that he worked at

---

[2]Although this point comes from Mr. Stokely's testimony, rather than Detective Gibson's, the Government argues this as a basis for finding both reasonable suspicion and good faith. The Court finds this fact to be generally consistent with the officers' testimony.

the railroad, and that he lived at the residence the officers wanted to search. None of these facts is remotely suggestive of criminal activity. Accordingly, the Court finds that Detective Gibson did not have reasonable suspicion to detain Mr. Stokely, even considering the collective knowledge of the officers on the scene of the Defendant's arrest, as the Government urges.[3]

The Government argues that upon her arrival at the Stokely residence to await Mr. Stokely, Detective Gibson observed a marijuana plant in the Stokelys' backyard. It contends that the observation of this controlled substance gave Detective Gibson reasonable suspicion to detain Mr. Stokely, while she investigated whether he was cultivating marijuana. The Court finds this claim by the Government to be unsubstantiated. The record contains a single reference to Detective Gibson observing a marijuana plant in the Stokelys' backyard.[4] On direct examination, AUSA Millican questioned Agent Bobich about her testimony that Investigator Hill reviewed the consent form with Mr. Stokely. AUSA Millican asked Agent Bobich why the narcotics unit was called to the residence that day, and Agent Bobich responded:

> When they–when Krystal first arrived at the house and, and was waiting, there was a large marijuana plant in the back yard that was observed. When we did a quick security sweep through the house, there was another pot out in the back. And then in the front living room, there was a small quantity of possible marijuana. So, they

---

[3]Although not referenced by either party, the Court notes that the audio/video recording of the arrest [Exh. 3]reveals that upon her arrival at the Family Dollar parking lot, Agent Bobich stated to other officers that "Toby doesn't have anything on him," meaning Mr. Stokely had no outstanding arrest warrants. Approximately twenty-nine minutes after the Defendant was stopped, Agent Bobich told the Defendant that "Toby has not been charged with anything at this time." Attributing this information to Detective Gibson, who was in continuous communication with the officers at the scene of the Defendant's arrest, only underscores the absence of any basis to detain Mr. Stokely.

[4]Investigator Hill testifies that she went to the residence "for the pot plants that were in the back yard[,]" but she did not state who had discovered the marijuana or when.

were contacted to come out to the house for the drug seizure.

First, and most importantly, the Court notes that Detective Gibson never mentioned seeing a marijuana plant in the Stokelys' yard. Although Detective Gibson testified after Agent Bobich, the Government did not question her about the marijuana plant, and she did not mention it in her account of what transpired. Defense counsel cross-examined Detective Gibson about what she did after she arrived at the property but before Mr. Stokely arrived, to which she responded only that she waited in her car.

Second, the time at which Detective Gibson saw the marijuana plant is not clear from Agent Bobich's testimony. Detective Gibson went to the Stokely residence twice on September 10, 2009. Although Agent Bobich's testimony that it was while Detective Gibson "was waiting" might be interpreted to suggest that it was during Detective Gibson's second trip to the house, Agent Bobich's testimony still does not reveal whether it was before Detective Gibson approached and handcuffed Mr. Stokely or after, while she was waiting for Agent Bobich to arrive. Third, Investigator Morrell testified that after the Defendant was transported from her home, he helped secure the area around the house. He did not mention the presence of a marijuana plant on the property. Fourth, both Agent Bobich and Detective Gibson testified that the narcotics unit was called to the house after the security sweep. The timing of the call for the narcotics unit suggests that the officers did not observe marijuana plants until well after Mr. Stokely was detained. Although these reasons center around the Court's inferences from the absence of evidence, taken together, they compel the Court to find that Detective Gibson did not see a marijuana plant growing in the Stokelys' back yard before she handcuffed Mr. Stokely. In this regard, the Court would note that the Government bears the burden of proving Mr. Stokely's valid consent and, thus, it was the

Government's responsibility to prove that Detective Gibson saw the marijuana plant in the back yard before encountering Mr. Stokely.

Having found the detention of Mr. Stokely to be unconstitutional in its inception, the Court will touch only briefly on the second prong of the reasonable suspicion analysis, whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. <u>Caruthers</u>, 458 F.3d at 464. The Government contends that Detective Gibson reasonably handcuffed Mr. Stokely for her own safety, because there were guns at the residence;[5] the police were investigating an armed robbery by the residents of the house;[6] Mr. Stokely was larger than Detective Gibson, who encountered him while she was alone and on foot; and Detective Gibson saw Mr. Stokely reach into his truck after he got out. When the circumstances of an investigatory detention reveal that the officer's safety is at risk, the Sixth Circuit has permitted greater intrusion into the detanee's personal freedom as a part of an investigatory detention. <u>See</u> <u>United States v. Hardnett</u>, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as a part of the <u>Terry</u> stop based upon tip that the occupants were armed). Specifically, handcuffing a suspect does not "exceed the bounds of a <u>Terry</u> stop, so long as the circumstances warrant that precaution." <u>Houston v. Clark County Sheriff Deputy John Does 1-5</u>, 174 F.3d 809, 815 (6th Cir. 1999) (upholding handcuffing of suspects believed involved

---

[5]The Government also states there was marijuana at the residence, but the Court has found that Detective Gibson was not aware of the marijuana during the time before Mr. Stokely signed the consent form.

[6]The Court finds that as far as the evidence at the suppression hearing reveals, only the Defendant was implicated in the armed robbery of the hotel in December 2008.

in a shooting); see also United States v. Atchley, 474 F.3d 840, 849 (6th Cir. 2007) (determining that officer's handcuffing of defendant during investigatory detention was appropriate as a "safety precaution" when officers were investigating tip of methamphetamine laboratory, defendant lied to officers, and defendant was nervous and evasive); United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001) (approving handcuffing of defendant at the inception of a Terry stop when the officers reasonably suspected defendant was carrying drugs and believed he might be armed due to their experience with drug traffickers); United States v. Hurst, 228 F.3d 751, 758 n.3 (6th Cir. 2000) (noting that "under the circumstances, where defendant was reasonably suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous, the officers' attempt to use handcuffs as a precautionary measure to secure their safety was not unreasonable or otherwise improper).[7] Although each of these cases turn on their individual facts, in each of them, the officer(s) had reason to believe the person being handcuffed posed a danger to the officer. In the present case, the Court questions Detective Gibson's need to handcuff Mr. Stokely upon her arrival, as nothing in the evidence suggests that he was either armed or dangerous. Nevertheless,

---

[7]The Court notes that the Sixth Circuit has also affirmed the use of handcuffs as a part of a Terry stop in several unpublished cases. United States v. Boyette, 295 Fed. Appx. 781, 785-86 (6th Cir. 2008) (determining that approaching car at gunpoint, handcuffing defendant and occupants, and detaining them in the police car was reasonably related to circumstances in which officers knew defendant to go armed and had information that he had a weapon in his car); United States v. Powell, No. 99-5137, 2000 WL 357262 (6th Cir. Mar. 29, 2000) (holding handcuffing of the defendant before conducting a frisk, which revealed the presence of a gun and drugs, was permissible as a part of a Terry stop due to officer's reasonable suspicion that the defendant was an armed carjacker); United States v. Monhollen, No. 97-5855, 1998 WL 152934 (6th Cir. Mar. 24, 1998) (holding handcuffing of defendant to be permissible as part of Terry stop when officer received a dispatch of a shooting and knew defendant had an extensive criminal history); United States v. Walker, No. 94-3521, 1995 WL 141343 (6th Cir. Mar. 31, 1995) (holding that officers reasonably handcuffed the defendant as a part of the Terry stop because the defendants tried to evade the officers and the officers suspected the defendants were armed based upon their past experience with drug traffickers).

any need to restrain Mr. Stokely in handcuffs due to the size disparity between he and Detective

Gibson evaporated when Officer Scalf arrived, which was at most five minutes later. The Court

finds that detaining Mr. Stokely in handcuffs for the entirety of the time between his arrival at his

home until he signed the consent form was unreasonable.

With regard to the length of the detention, an officer's reasonable suspicion permits

the officer to detain the suspect while asking a moderate number of questions to identify the suspect

and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's

answers fail to supply the officer with probable cause to arrest the suspect, then the officer must

release the suspect. Id. at 397. In the present case, the Government argues that the officers were

engaged in continuous activity aimed at gathering evidence and confirming or dispelling Detective

Gibson's reasonable suspicions with regard to the armed robbery, the cultivation of marijuana at the

residence, and the illegal possession of firearms. In a valid Terry stop, the officer's investigation

must be conducted such that the officer may either confirm or dispel the officer's suspicions about

the detained individual. Here, the officer's actions were directed at gathering evidence to use

against the Defendant. Setting aside for a moment the fact that Detective Gibson had no suspicions

about Mr. Stokely, she did not ask him any questions during the twenty-plus minute wait. Instead,

she testified that they engaged in casual conversation. Mr. Stokely testified that he tried to get

Detective Gibson and the male officer to tell him what was happening, but she claimed he would

have to wait for the ATF agent to arrive.[8] Thus, the Court finds that the intrusiveness of the

investigatory detention–detaining Mr. Stokely in handcuffs for nearly twenty-five minutes without

---

[8]The Court notes that the absence of any questions about a marijuana plant in the backyard serves to confirm the Court's finding that Detective Gibson did not see a marijuana plant before she seized Mr. Stokely.

asking him any questions to either confirm or dispel the officers' suspicions–was not reasonably related to the circumstances presented to the officers.

The Defendant argues that Detective Gibson illegally detained Mr. Stokely in handcuffs without an arrest warrant or probable cause to arrest him. "The general rule is that 'a police confinement which . . . goes beyond the limited restraint of a Terry investigatory stop may be constitutionally justified only by probable cause.'" Richardson, 949 F.2d at 858 (quoting Royer, 460 U.S. at 496). The Court finds that Detective Gibson did not have reasonable suspicion to stop Mr. Stokely, much less probable cause to believe that he had committed any crime. Accordingly, the illegal detention of Mr. Stokely was tantamount to an arrest without probable cause.

Having found that Mr. Stokely was illegally seized, detained, and in essence arrested, the Court turns to the impact of that Fourth Amendment violation on his subsequent consent to search his home. "If consent is given after an illegal seizure, that prior illegality taints the consent to search." United States v. Richardson, 949 F.2d 851, 858 (6th Cir. 1991) (citing Florida v. Royer, 460 U.S. 491, 507 (1983)); see also United States v. Crowder, 62 F.3d 782, 786 (6th Cir. 1995) (observing that unlike a Fifth Amendment violation, after which a confession can still be found admissible as voluntary, a "Fourth Amendment violation taints a subsequent confession," unless the government can show it was both voluntary and sufficiently attenuated from the Fourth Amendment violation). The consent may still be valid, despite the illegal seizure, if the consent "is given at a time that is sufficiently attenuated from" the prior illegality, in which case "the taint may be considered to have been dissipated[.]" Richardson, 949 F.2d at 858 (citing Brown v. Illinois, 422 U.S. 590, 603 (1975)). "Factors to consider in determining whether the consent is sufficiently removed from the taint of the illegal arrest include the length of time between the illegal seizure and

the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." Id. at 859.

In Richardson, our appellate court found that the defendant was illegally arrested when officers approached him outside of his storage unit, asked for consent to search the unit, and detained him in the police car when he refused to grant consent. Id. at 857-58. The defendant was detained in the police car for twenty minutes, during which time he refused consent twice more, before changing his position and granting consent upon learning of his companion's confession and being informed that the police would seek a warrant if he refused consent. Id. at 854. The Sixth Circuit held that the taint of the illegal arrest had not dissipated during the twenty minutes in which the unconstitutional seizure continued:

> [T]he nature of the taint in this case is significant: the constitutional violation was blatant. As previously noted, Richardson was placed in the back of a police car and would not have been permitted to leave. After approximately twenty (20) minutes, he consented to the search. We do not believe that the taint had dissipated after merely twenty (20) minutes of continued improper conduct. Thus, we hold that the taint of the illegal arrest vitiated Richardson's consent and that the immediate fruits of the consent should have been suppressed.

Id. at 859.

The present case is strikingly similar to that in Richardson. Mr. Stokely was illegally detained and during the twenty-four minutes between the initial illegal seizure and his consent, nothing save the same unconstitutional conduct–him being detained on his porch in handcuffs–occurred to dissipate the taint. Instead, there is evidence that during this time, Mr. Stokely's son arrived and was also handcuffed and detained on the porch. The Court does not find that Detective Gibson's review of the consent-to-search form was sufficient to overcome the taint caused by the illegal detention. See United States v. Grant, 822 F. Supp. 1270, 1277-78 (W.D.

Tenn. 1993) (concluding that advice of <u>Miranda</u> rights not sufficient to overcome taint of illegal seizure). Finally, it is the Government's burden to prove any attenuating circumstances or events, a burden which it has failed to carry. Accordingly, the Court finds that Mr. Stokely's illegal detention vitiates his subsequent consent.

In the event that the District Court might disagree with this finding, the Court will look briefly at the Defendant's two alternative bases for contending that Mr. Stokely's consent was invalid: That he merely acquiesced to the officers' claims that they had a search warrant and that the circumstances of his consent were coercive.

*(2) Acquiescence*

The Defendant contends that Mr. Stokely merely acquiesced to the authority of the law enforcement officers, who told him that they had a search warrant to search his home. "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion-albeit colorably lawful coercion. Where there is coercion there cannot be consent." <u>Bumper v. North Carolina</u>, 391 U.S. 543, 550 (1968). In the present case, the only evidence that Agent Bobich told Mr. Stokely that she had a search warrant for the search of the residence comes from Mr. Stokely's testimony. The Court notes that Reverend Robinson also testified that after the search, Mr. Stokely called her and told her that he had wanted the officers to show him a search warrant but they never showed one to him. The Court finds that the idea that Mr. Stokely would have liked the officers to produce a search warrant is an entirely different matter from them telling them they had one. Moreover, this information is from Mr. Stokely, being relayed by his mother who was not present

at the time of the search. Thus, the Court does not find this testimony by Reverend Robinson to constitute substantial corroboration of Mr. Stokely's assertion that Agent Bobich told him that she had a search warrant. The evidence to the contrary consists of the testimony of Agent Bobich, Detective Gibson, Investigator Morrell, and Investigator Hill that no one ever mentioned a search warrant to Mr. Stokely and the consent to search form [Exh. 4], executed by Mr. Stokely. The form states that Mr. Stokely was advised of his "constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse such a search[.]" The Court finds that Agent Bobich did not tell Mr. Stokely that she had a search warrant for the search of his home. Accordingly, the Court finds this argument to be without merit.

*(3) Coercion/Deception*

Finally, if Mr. Stokely's illegal seizure and detention itself was not sufficient to vitiate his subsequent consent, the Court examines whether the circumstances surrounding the consent, including his illegal detention, taken together were coercive such that he could not voluntarily consent. Valid consent to search cannot be the product of coercion or duress. Worley, 193 F.3d at 386; Cooke, 915 F.2d at 252. The voluntariness of a consent to search is determined by an examination of the totality of the circumstances:

> Those circumstances include "evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights," Bustamonte, 412 U.S. at 248, . . ., as well as evidence concerning "the youth of the accused," "the length of detention," "the repeated and prolonged nature of the questioning," and "the use of physical punishment such as the deprivation of food or sleep." Id. at 226, . . . . Further, the accused's knowledge of his right to refuse to consent is only one factor–not a prerequisite–in establishing voluntary consent. Id. at 249, . . . .

United States v. Crowder, 62 F.3d 782, 787 (6th Cir. 1995). The fact that the person is properly in custody at the time he or she gives consent is not alone coercive. Id. Instead, the following factors indicate a voluntary consent despite the person's custodial status:

> the absence of any overt act or threat of force against the defendant; the absence of any promises to the defendant or any indication of "more subtle forms of coercion that might flaw his judgment"; the defendant's giving his post-arrest consent on a public street and not in the confines of the police station; the absence of any indication that the defendant was "a newcomer to the law, mentally deficient, or unable in the face of custodial arrest to exercise a free choice"; and the defendant's receiving Miranda warnings and notification that the results of the search could be used against him.

Id. (quoting United States v. Watson, 423 U.S. 411, 424-25 (1976)).

As observed by the Government, most of the circumstances noted in Bustamonte and quoted above weigh in favor of a voluntary consent. Mr. Stokely is an intelligent, well-spoken individual with some post-high school education and a job that suggests that he is both responsible and reliable. Additionally, the Court finds that Mr. Stokely was informed of his right to refuse consent to search in the consent-to-search form, which Detective Gibson read to him and which he signed. The Court notes that Mr. Stokely testified that he was not advised of his right to refuse consent and that he was tricked into signing the consent-to-search form by an officer folding it in half so that he could not read its contents as he signed it. The Court finds the testimony of Agent Bobich and Detective Gibson to be more credible on this point. Agent Bobich and Detective Gibson's testimony is corroborated by the testimony of Investigator Hill that she obtained the signed consent form from Agent Bobich and again reviewed it with Mr. Stokely prior to entering his house. With regard to the matter of credibility, the Court is mindful that false testimony regarding the execution of a consent-to-search form might well cost these officers their jobs.

Returning to the considerations noted in <u>Bustamonte</u>, Mr. Stokely is not particularly youthful, although there is no evidence that he was familiar with the criminal justice system due to a prior criminal history. Mr. Stokely was detained for approximately twenty-five minutes from his arrival at the residence to the execution of the consent form. Although not extraordinarily long, the Court finds this time in detention to be significant, especially in light of the fact sthat he was illegally detained and unreasonably handcuffed. There is no evidence that Mr. Stokely was subjected to repeated or prolonged questioning. In fact, the evidence suggests that Mr. Stokely remained uninformed about what was occurring until Agent Bobich arrived, although he tried to question the officers himself about what was happening. Finally, the evidence regarding the effect of the detention on Mr. Stokely's physical needs is evenly balanced because although Mr. Stokely testified that the handcuffs and concrete porch aggravated his old sports injuries and arthritis, he also stated that he was permitted to smoke.

The considerations mentioned in <u>Watson</u> and also quoted above, however, cast a different light on Mr. Stokely's consent. Mr. Stokely was subjected to unjustified physical force when he was handcuffed upon his arrival at his residence. Although the officers did not make any promises to Mr. Stokely, the Court finds that "more subtle forms of coercion" that could affect his judgment were in play. Mr. Stokely testified that while he was seated on his porch in handcuffs, his son arrived, was handcuffed, and was also detained on the porch. During cross-examination on the number of officers on the porch with Mr. Stokely at the time he again gave consent, Investigator Hill mentioned that a young boy was on the porch with Mr. Stokely. She did not say whether the boy was also in handcuffs, but the Court finds this point remained unrebutted at the conclusion of the proof. The Court finds that the handcuffing of Mr. Stokely's young child to be a coercive

circumstance that would influence his judgment. "[A]ntagonistic actions by the police against a suspect's family taint the voluntariness of any subsequent consent." United States v. Ivy, 165 F.3d 397, 403 (6th Cir. 1998) (holding that the handcuffing of the defendant's girlfriend and the taking of her and the defendant's infant from her arms "significantly undermine[d] the voluntariness of any subsequent consent given by the [defendant]"). Although the location of the consent–at Mr. Stokely's home on his porch, rather than at a police station–was not coercive, the evidence does not reveal that Mr. Stokely was experienced with the criminal justice system. The Court finds that as many as five police officers (Detective Gibson, Agent Bobich, Officer Scalf, Detective Lodwick, and Detective Schmidt) were present on the porch or in the yard when Mr. Stokely signed the consent form, but Mr. Stokely expressly testified that he was not intimidated by the officers. Finally, Mr. Stokely did not receive the Miranda warnings but was notified by the consent-to-search form that the fruits of the search could be used as evidence.

Examining all of these circumstances together, the Court finds that the circumstances themselves were so coercive that Mr. Stokely could not voluntarily consent. The Court finds that the illegal seizure and detention in particular and the unexplained handcuffing of Mr. Stokely's young son overcame the advice of rights that Mr. Stokely received. Accordingly, the Court finds that Mr. Stokely's consent was invalid, even if the Fourth Amendment violation did not render it so from the onset of his detention.

### C. Application of the Exclusionary Rule

Relying on the Supreme Court's recent decision in Herring v. United States, 129 S. Ct. 695 (2009), the Government argues that even if the Court finds that the officers did not have

valid consent to search the residence, the exclusionary rule should not be applied to the evidence gleaned as a result of the search. It asserts that Detective Gibson detained Mr. Stokely based upon a good-faith belief in the existence of reasonable suspicion to detain him and that handcuffing him for her own safety was reasonable under the circumstances. It contends that the officer's conduct was not sufficiently culpable that suppression of the evidence can meaningfully deter it in the future.

Not every Fourth Amendment violation results in the exclusion of the evidence obtained. See Herring,129 S. Ct. at 700. Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" Herring, 129 S. Ct. at 700 (quoting Illinois v. Krull, 480 U.S. 352-53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." Id. at 698.

Thus, the Supreme Court has recognized that certain Fourth Amendment violations do not involve law enforcement officers' own misconduct and that excluding evidence in those cases would not deter wrongful police conduct. As such, the Supreme Court as developed a number of "good faith" exceptions to the exclusionary rule. These include (1) reliance on a search warrant that is later found to be unsupported by probable cause, United States v. Leon, 468 U.S. 897, 922 (1984); (2) reliance on a search warrant that contains clerical errors, Massachusetts v. Sheppard, 468 U.S.

981, 991 (1984); (3) reliance on a statute with a constitutional defect that was not "sufficiently obvious," Krull, 480 U.S. at 349-50; and (4) reliance on mistaken data or information from a judicial employee, Arizona v. Evans, 514 U.S. 1, 15 (1995). See also Herring, 129 S. Ct. at 701. In Herring, the Court declined to apply the exclusionary rule to a Fourth Amendment violation stemming from the negligence of police personnel in failing to remove a withdrawn arrest warrant from the computer, finding that an "error that arises from nonrecurring and attenuated negligence is thus far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place." Id. at 702. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. In other words, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Id.

In the present case, Detective Gibson's decision to detain Mr. Stokely and to place him in handcuffs was based upon her own erroneous assessment that either she or the officers directing her to detain Mr. Stokely had a valid basis to do so. As discussed at length above, that determination was woefully incorrect. Unlike the officers in Herring who relied upon the representation of other law enforcement personnel that an arrest warrant was outstanding or the officers executing the search warrant in Leon who relied upon the judge's determination that probable cause to issue a search warrant existed, Detective Gibson made the decision to detain Mr. Stokely at the scene based upon her and her fellow officers' assessment that such detention was necessary and legal. Thus, the Fourth Amendment violation in this case resulted from the deliberate action of law enforcement and is of a type that could be deterred by exclusion of the evidence.

In concluding that the circumstances carved out by <u>Herring</u> do not apply in this case, the Court observes that the Fourth Amendment clearly evidences a "strong preference" for searches conducted pursuant to a search warrant. <u>Illinois v. Gates</u>, 462 U.S. 236 (1983). In fact, when "officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant[.] . . . . Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." <u>McDonald v. United States</u>, 335 U.S. 451, 454-55 (1948 (holding that where defendant had been under surveillance for two months, "[n]o reason, except inconvenience of the officers and delay in preparing papers and getting before a magistrate, appears for the failure to seek a search warrant"); <u>United States v. Chambers</u>, 395 F.3d 563, 566 (6th Cir. 2005) (quoting <u>McDonald</u>). Thus, law enforcement should "seek a warrant based on probable cause when they have a belief in advance that they will find contraband or evidence of a crime. They may only forego a warrant in the case of a true exigency or emergency." <u>Chambers</u>, 395 F.3d at 566. In this case, the record before the Court reveals that the officers had ample opportunity to seek a search warrant for the search of the Defendant's home. The Defendant, a felon, had admitted to Agent Bobich that she possessed a twelve gauge shotgun that was located at her residence under her bed. The Defendant was in custody and Mr. Stokely was at work, unaware of the desire to search his home until contacted by the officers. Detective Gibson had established earlier that day that no one was at the residence to disturb the evidence. Despite having an apparent basis and opportunity to seek a search warrant, the officers instead chose to seek consent. The law and this Court requires that they do so within the bounds of the Constitution. The Court recommends that the Defendant's Motion to Suppress Evidence [Doc. 14] be granted.

# V.  CONCLUSION

After carefully considering the motion, memoranda, testimony, exhibits, and oral arguments and after reviewing the relevant legal authorities, the Court finds that the warrantless search of the Defendant's home violated the Fourth Amendment because the officers did not have valid consent.  For the reasons set forth herein, it is **RECOMMENDED** that the Defendants' Motion to Suppress Evidence  [**Doc. 14**] be **GRANTED**.[9]

Respectfully submitted,


    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[9]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).